# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

EXTRA EQUIPAMENTOS E )
EXPORTACAO LTDA. and PERSIO D. )
BRIANTE, )  No. 01 C 8591
     Plaintiffs, )
           )  Hon. Blanche M. Manning
  v.         )
           )
CASE CORPORATION, )
     Defendant. )

## MEMORANDUM AND ORDER

Plaintiffs Extra Equipamentos E Exportacao Ltda. and Persio D. Briante (collectively, "Extra") filed the instant diversity action against Defendant Case Corporation ("Case") alleging fraudulent misrepresentation, negligent misrepresentation, and promissory fraud in connection with an agreement Extra entered into with Case Brasil & Cia ("Case Brasil"), Case's Brazilian subsidiary, which is not named as a defendant in this action.

The current matter is before the Court on Case's motion to dismiss Extra's Amended Complaint ("the Complaint"), pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 12(b)(7), and 19, as well as on the grounds of forum non conveniens.[1] In the alternative, Case seeks to strike certain paragraphs in the Complaint under Rule 12(f). For the reasons that follow,

---

[1] This motion comes before this Court on remand from the Seventh Circuit. In a prior opinion (2002 WL 1888540), this Court dismissed this case on the grounds that Extra failed to join an indispensable party (Case Brasil). The Court, however, did not discuss the other grounds on which Case moved to dismiss. On March 15, 2004, the Seventh Circuit, in Extra v. Case, 361 F.3d 359 (7th Cir. 2004), vacated and remanded this dismissal order. The Court will now address the motion to dismiss consistent with the dictates of the Seventh Circuit and on the other grounds set forth in Case's motion.

the Court: (1) DENIES the motion to dismiss with respect to the fraud claims but GRANTS it as to the negligent misrepresentation claim; and (2) DENIES the motion to strike.

## BACKGROUND[2]

### The Parties

Extra is a Brazilian corporation which sells heavy farm and construction equipment in Brazil. At the time of the allegations in the Complaint, Extra was the leading distributor of Case products in Brazil. Briante, a citizen of Brazil, is the chief officer of Extra. Case, a Delaware corporation headquartered in Wisconsin, manufactures agricultural and construction machinery. Case Brasil is a Brazilian subsidiary of Case, whose principal business is the sale of Case equipment in Brazil.[3]

### Extra's Distributorship in Brasil

Since 1992, Extra has sold Case construction and farm equipment pursuant to distribution agreements between Extra and Case Brasil. Extra contends that although it was the largest distributor of Case equipment in Latin America, senior executives at Case Brasil were improperly debiting Extra's account with Case Brasil to inflate Case Brasil's revenues and line their own pockets. According to Extra, Case Brasil was approving high risk loans for farm equipment on behalf of Extra. When the customers defaulted, Case Brasil then debited the bad loans against Extra's account with Case Brasil, thereby cheating Extra out of revenue which it

---

[2]     The facts in the background section are drawn from the Complaint. Although this Court discussed the facts in its prior opinion, it will again set forth the relevant facts as they relate to the issues presently before the Court.

[3]     Case Brasil is a "100% subsidiary" of Case. Extra v. Case, 361 F.3d 359, 364 (7th Cir. 2004).

had rightfully earned and forcing Extra to absorb the losses for loans which it had no part in procuring.

As a result of these improper charge backs, in July of 1999, Extra brought suit against Case Brasil in Brazil ("the Brazilian Action"), seeking: (a) payment of all commissions owed to Extra; (b) reversal of the illegitimate debits transferred to Extra's current account; and (c) payment for repairs and parts provided by Extra to Case Brasil's "commission" customers.

Around the time of the Brazilian Action, Case began investigating suspected improper activities of executives at Case Brazil and was involved in negotiations for a merger with another company. The executives, who were being investigated, were the same individuals who allegedly forced Extra to accept the improper charge backs. According to Extra, Case knew that the top managers at Case Brasil were acting in an improper and fraudulent manner but could not find proof to sustain their suspicions. Extra also contends that Case was concerned that if the suspected improper activities at Case Brasil became public, its anticipated merger would be put at risk. Case was also troubled that Extra had filed objections to its pending merger with the Brazilian government.

### The Waukegan Agreement

In October of 1999, Case's in-house counsel and counsel for Extra began negotiations to resolve the Brazilian Action and to assist Case with its merger and its internal investigation of Case Brasil. Shortly after an initial meeting in Brazil, Extra and Case agreed that Mr. Briante (Extra's president) and the head of Case's Latin American operations (Mr. James Sharman) would meet in Waukegan, Illinois, on October 19, 1999, to sign an agreement resolving the above issues (the "Agreement" or "Waukegan Agreement").

3

Under the terms of the Waukegan Agreement, which was drafted the night before by Case's in-house counsel without consulting anyone at Case Brasil, Case Brasil agreed to: (1) continue Extra's distributorship on terms at least as favorable as those offered other distributors; (2) resolve the alleged improper charge backs by capping Extra's liability at a set amount; and (3) present Extra with a "controlling Portugese version" of the Agreement. In exchange for these concessions, Extra agreed to: (1) supply Case with information it needed to prove the wrong-doing by management at Case Brasil; and (2) not interfere with Case's anticipated merger.

Although not officers at Case Brasil, Mr. Sharman, who executed the Agreement on behalf of Case Brasil, and Case's in-house counsel allegedly assured Extra that Mr. Sharman had the authority to bind Case Brasil and that Case Brasil would abide by the terms of the Agreement. Indeed, the Agreement states that it was "entered into by and between Case Brasil & Cia and Equipamentos Exportacao Ltda" and defines the term "Case" to include "Case Brasil & Cia, Case Corporation, and their past, present, and future: subsidiaries, divisions, parent corporation, predecessors. . . ." Also set forth in the Agreement was a clause which stated: "Representation and Warranty As to Authority. Each [p]erson signing this document represents and warrants that he or she has full authority to enter into [this Agreement]."

Based on Case's representations and the terms of the Agreement, Extra immediately supplied Case with information detailing the wrongful conduct of the Case Brasil officers. With this evidence, Case was able to "fire" the wrong-doers at Case Brasil and take back control of its subsidiary. Also, with its internal problems resolved and without any objection from Extra, Case was able to successfully complete its merger.

Despite having fully complied with its obligations under the Agreement, Extra alleges that Case Brasil, although a 100% subsidiary of Case, has completely ignored its obligations under the Agreement. Case Brasil contends that the Waukegan Agreement is not binding because Mr. Sharman was not a Case Brasil officer nor was he authorized to bind Case Brasil. Case, despite representations to the contrary, has done nothing to ensure that Case Brasil follow the terms of the Agreement. In fact, Case Brasil has sought to terminate Extra's distributorship. Adding insult to injury, Case now allegedly contends that the Agreement was negotiated between Extra and Case Brasil, and therefore, this dispute is solely between them.

As a result of the above actions, in November of 2001, Extra filed its initial complaint against Case, alleging breach of contract and fraud. Extra alleged that Case breached the Agreement by its failure to have Case Brasil abide by its obligations thereunder, such as fixing the improper charge backs and retaining Extra as a distributor.

In response to the original complaint, Case filed its initial motion to dismiss for failure to join an indispensable party (Case Brasil) and on grounds of forum non conveniens. After interpreting the language of the Agreement, this Court held in an August 13, 2002 Memorandum and Order ("August Order") that Case Brasil was a party to the Agreement and therefore was a necessary and indispensable party under Rule 19. This determination was based in part on the language of the Agreement, which defines "Case" to include Case Brasil; states the signing parties are identified in the contract as "EXTRA EQUIPAMENTOS EXPORTACAO LTD." and "CASE BRASIL & CIA"; and contains the subheading "[t]his Release… is entered into by and between Case Brasil & Cia and Extra Equipamentos Exportacao Ltda." Accordingly, the Court granted the motion to dismiss the initial complaint.

5

The Court, however, withdrew its August Order, on November 22, 2002, because Extra did not respond to the initial motion to dismiss before the Court issued its dismissal order. Case filed its initial motion to dismiss on January 7, 2002. Instead of appearing before this Court to seek an extension of the briefing schedule on the initial motion to dismiss, however, Extra simply sought leave from the magistrate judge to take limited jurisdictional discovery without notifying this Court. Consequently, because Extra did not respond to the initial motion to dismiss, this Court ruled on the motion. When withdrawing the August Order dismissing this action, this Court set a briefing schedule and granted Extra leave to amend its complaint.

In an attempt to plead around this Court's August Order finding that Case Brasil was a party to the Agreement and therefore an indispensable party, Extra does not allege breach of contract in its Amended Complaint. Instead, Extra has pled only tort claims solely against Case. The Amended Complaint alleges fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), and promissory fraud (Count III). Extra contends that Case "perpetrated a fraudulent scheme" and "made utterly reckless misrepresentations" to Extra to induce Extra to enter into the Agreement. Case allegedly "manipulated the corporate distinction between itself and Case Brasil" and misrepresented that Mr. Sharman had authority to sign the agreement on behalf of Case Brasil, when he in fact did not. Extra alleges that Case knew that Case Brasil, who was to take action under the Agreement, would not follow or comply with the terms of the Agreement and that Mr. Sharman did not have the authority to bind Case Brasil.

In response to the Amended Complaint, Case filed the instant motion to dismiss.

6

## ANALYSIS

Case contends that dismissal is proper on the grounds that: (I) Extra failed to join an indispensable party (Case Brasil); (II) Brazil is the proper location for this action (forum non conveniens); and (III) the Complaint does not sufficiently allege a cause of action. In the event that dismissal is not granted, Case seeks to strike portions of the Complaint. The Court will address each of these contentions in turn.

## I.    Failure to Join an Indispensable Party[4]

In an opinion dated June 6, 2003 (2002 WL 1888540), this Court found that Case Brasil was a necessary and indispensable party under Rule 19, and therefore, dismissed this action for failure to join an indispensable party. On appeal, the Seventh Circuit vacated and remanded this dismissal "consistent with the guidance provided by this opinion." In so holding, the court held that in analyzing "indispensability," the district court should have taken into account the fact that Case Brasil was a "100 percent subsidiary" of Case. According to the Seventh Circuit, it is extremely unlikely that Case Brasil would be prejudiced if not a party to this action because Case would fully protect Case Brasil's interests as it is its wholly owned subsidiary.[5]    Therefore,

---

[4]    In ruling on a motion to dismiss for failure to join an indispensable party, the court must accept the allegations of the complaint as true. Davis Companies v. Emerald Casino, Inc., 268 F.3d 477, 479 (7th Cir. 2001); Pasco Int'l (London) Ltd. v. Stenograph Corp., 637 F.2d 496, 499 (7th Cir. 1980). The court may, however, look outside of the pleadings and consider extrinsic evidence. Davis, 268 F.3d at 480; English v. Cowell, 10 F.3d 434, 437 (7th Cir. 1993); Capitol Leasing Co. v. Fed. Dep. Ins. Corp., 999 F.2d 188, 191 (7th Cir. 1993).

[5]    Rule 19(b) provides four factors to be considered in determining whether a party is "indispensable." These factors are: "(1) the extent to which a judgment entered in the absence of a party will be prejudicial to those currently before the court; (2) the extent to which such prejudice can be lessened or avoided by reshaping the judgment; (3) whether a judgment entered in a party's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed." Moore v. Ashland Oil, Inc., 901 F.2d 1445, 1447 (7th Cir. 1990).

7

the court noted that one of the Rule 19(b) factors (prejudice to the absent party) could likely not be met. In reaching this conclusion, the court stated that "we have great difficulty seeing how a 100 percent subsidiary could _ever_ be an indispensable party." (Emphasis in original.)

Following the above instructions, this Court has not found, nor has Case cited, any authority or facts supporting the conclusion that Case Brasil (as a 100 percent owned subsidiary) would or could be overtly prejudiced by not being a party to this action. Accordingly, this Court, in the exercise of its discretion, now finds a judgment in this case would not prejudice Case Brasil to such an extent as to render it an indispensable party.

## II. Forum Non Conveniens[6]

The Court next turns to whether this action should be dismissed under the forum non conveniens doctrine. Under this doctrine, a court may dismiss an action "over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." Kamel v. Hill-Rom Co., 108 F.3d 799, 802 (7th Cir. 1997). Dismissal, however, is only appropriate if the chosen forum "would result in vexation and oppression to the defendant which would far outweigh the plaintiff's convenience." Id.

In ruling on a forum non conveniens motion, courts must: (1) assess whether there is an adequate alternative forum; and (2) balance the private and public interests factors.[7] Id. at 802-

---

[6] As in the motion to dismiss for failure to join indispensable parties, in ruling on a forum non conveniens motion the Court may look at facts outside the four corners of the complaint. See Hidrovia v. Great Lakes Dredge & Dock Corp., 2003 WL 2004411, at *3 (N.D. Ill. April 28, 2003).

[7] An adequate alternative forum exists if "all parties are amenable to process" and "the parties will not be deprived of all remedies or treated unfairly." Kamel, 108 F.3d at 802. Here, the parties do not contest that Brazil is an adequate alternative forum. Moreover, in the appeal of the Rule 19 motion, the Seventh Circuit held that "Case is suable [in Brasil]" because "it moved to have the case transferred [there], and we take this to be binding consent to be sued there."

03. Private factors include: the plaintiff's choice of forum[8]; location and access to evidence and witnesses; convenience to the parties and the witnesses; and any other "practical problems that make trial of a case easy, efficient and economical." Id. at 803. The public interest factors consist of:

> the administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of law or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Id.

The defendant bears the burden of persuasion of the private and public factors. Gupta v. Austrian Airlines, 211 F. Supp. 2d 1078, 1087 (N.D. Ill. 2002). To meet this burden, the movant must "provide enough information to enable the court to balance the parties' interests." Id. Exactly how much information must be provided is left to the discretion of the district court and should be decided on a case by case basis. See, e.g., Hidrovia., 2003 WL 2004411, at *3. Generally, the defendant does not need to provide detailed affidavits "identifying the witnesses [it] would call and the testimony these witnesses would provide if the trial were held in an alternative forum." Piper, 454 U.S. at 258. The defendant, however, must at least identify the specific witnesses who will not be able to testify in the chosen forum and the documents vital to the action which are located in the alternative forum. See Gupta, 211 F. Supp. 2d at 1087; Hidrovia., 2003 WL 2004411, at *3. The defendant must present sufficient information for the

---

Extra v. Case, 361 F.3d 359, 361 (7th Cir. 2004).

[8]    Although the plaintiff's choice of forum is usually given great deference, where the plaintiff is foreign corporation, its choice is accorded little deference. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 266 (1981).

court to "have a basis upon which to scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are crucial, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action." In re Bridgestone, Inc., 305 F. Supp. 2d 927, 933 (S.D. Ind. 2004). In other words, the court must look at the access to proof factor in context of the "gravamen" of the claim and "where the dispute is centered." See Hidrovia., 2003 WL 2004411, at *3. Where the defendant "fail[s] to identify any necessary document, witness, or third-party defendant located in [the foreign country], which would be unavailable for trial" in the chosen forum, courts generally find that the private interest factor does not favor dismissal. See In re Bridgestone, Inc., 305 F. Supp. 2d at 933.

Here, after carefully examining the parties' submissions and the Complaint, this Court, in exercise of its discretion, finds that neither the private nor public factors support dismissal of this case under the forum non conveniens doctrine. The two factors pertinent to this Court's decision (which are the two factors Case raises in its motion) are whether the key witnesses and documents needed to resolve this action are located in Brazil and whether this Court will have to apply Brazilian law.

Case has not set forth any specific names of witnesses or documents pertinent to the germane issues in this case that are located in Brazil. Instead, Case states generally that the "relevant documents" and Case Brasil employees with knowledge of Case Brasil's non-compliance with the terms of the Waukegan Agreement are located in Brazil. Thus, according to Case, the access to witnesses and documents factor favors dismissal.

10

Case's contention is misguided. It is undoubtedly true that some documents and witnesses supporting Case Brasil's failure to perform under the Agreement are located in Brasil. Extra, however, does not seek redress for Case Brasil's breach of the Waukegan Agreement. Instead, Extra has pled tort claims – negligent and fraudulent misrepresentation and promissory fraud – solely against Case. Extra contends that Case "perpetrated a fraudulent scheme" and "made utterly reckless misrepresentations" to induce Extra to enter into the Agreement. Specifically, Case allegedly "manipulated the corporate distinction between itself and Case Brasil" and misrepresented Mr. Sharman's authority to sign the agreement on behalf of Case Brasil. These misrepresentations were made by Case employees from their headquarters in Racine, Wisconsin and/or in Waukegan, Illinois. While testimony of Case Brasil employees and documents located in Brazil could be relevant in this case, such evidence would only shed light on tangential issues – e.g., whether and why Case Brasil refused to honor the Waukegan Agreement. This evidence, however, is not necessary for this Court to determine if case made misstatements or used fraud to induce Extra to enter into the Waukegan Agreement.

Likewise, Case's contention that Brazilian law governs this action is incorrect. Federal courts sitting in diversity apply the choice of law doctrine of the state in which the court sits (in this case Illinois). ECHO, Inc. v. Whitson, Co., 52 F.3d 702, 706 (7th Cir. 1995). In tort cases, Illinois uses the "most significant relationship" test adopted from the Restatement (Second) of the Conflict of Laws.[9] Reid v. Norfolk & Western Ry. Co., 157 F.3d 1106, 1110 (7th Cir. 1998).

---

[9] The choice of law clause in the Waukegan Agreement (requiring the Agreement be interpreted under Brazilian law) is not dispositive because Extra alleges claims for tort not breach of contract. See First Nat'l Bank of Boston v. Heuer, 702 F. Supp. 173, 175-76 (N.D. Ill. 1988) (applying the most significant relationship test in a tort action for fraudulent misrepresentation in the context of a contract, the court disregarded the contract's choice of law provision because the "action [was] in tort, not contract").

In applying the most significant relationship test, courts consider: (1) the place of the injury; (2) the location of the tortious conduct; (3) the domicile of the parties; and (4) the center of the parties' relationship. Fredrick v. Simmons Airlines, Inc., 144 F.3d 500, 503-04 (7th Cir. 1998).

The above factors are not applied equally or consistently in all tort actions. For example, in First National Bank of Boston v. Heuer, 702 F. Supp. 173, 174 (N.D. Ill. 1988), the plaintiff, a Massachusetts company, brought an action for fraudulent misrepresentation against a company located in Illinois. The plaintiff alleged that the defendant made misrepresentations in securing a line of credit. Id. Applying the most significant relationship test, the court held that "in cases of fraud and or misrepresentation, unlike personal injury actions, the place of loss is less important than the place the defendant allegedly made the misrepresentations." Id. at 175-76. The court thus found that Illinois law applied "because the alleged misrepresentations were made in Illinois" by an Illinois resident. Id. at 176. See also Snyder v. Fahim, 1987 WL 14022, at *3 n.1 (N.D. Ill. July 16, 1987) (applying the most significant contacts test in a fraudulent misrepresentation case, the court held that Missouri law applied because the defendant's "fraudulent conduct took place in Missouri"); Gates Rubber Co. v. USM Corp., 351 F. Supp. 329, 338-39 (N.D. Ill. 1972) (applying New York law because the fraudulent misrepresentations were made there), rev'd on other grounds, 508 F.2d 603 (7th Cir. 1975).

Here, while Extra's injuries and its relationship with Case Brasil are centered in Brazil, the misrepresentations which are at the heart of the tort claims in the Complaint were made by Case to Extra in Illinois. Case allegedly induced Extra to come to Illinois and sign the Waukegan Agreement based on its false representations that it "had full authority to bind Case Brasil." The Agreement itself, which was drafted by Case's in-house counsel in Illinois or

12

Wisconsin, stated that it was between Case Brasil and Extra and warranted that the signer for Case (Mr. Sharman) had authority to bind Case Brasil. According to Extra, these statements were all false because Case knew at the time of making these statements that Mr. Sharman had no such authority and that Case Brasil would not abide by the terms of the Agreement. This Court thus finds that Illinois law applies because all (or at least the majority) of the alleged misrepresentations were made in Illinois.

Accordingly, this Court denies the motion to dismiss on forum non conveniens grounds. Also relevant to this Court's decision is the fact that Extra has "chosen a forum which is [in Case's] own back yard," and thus Case can hardly complain about this venue being inconvenient. See Gassner v. Stotler and Co., 671 F. Supp. 1187, 1190-91 (N.D. Ill. 1987) (denying forum non conveniens motion where plaintiffs, who were German citizens, sued an Illinois partnership in federal court in Chicago for fraudulent activity perpetrated by the defendant in Illinois).

### III.    12(b)(6) Motion to Dismiss[10]

Case also moves to dismiss this action under Rule 12(b)(6) on the grounds that Extra has

failed to plead a claim for misrepresentation (both fraudulent and negligent) or promissory fraud

and that Extra has failed to plead fraud with sufficient particularity as required by Rule 9(b).[11]

### A.    Misrepresentation Claims

To plead a claim for fraudulent misrepresentation under Illinois law, a plaintiff must

allege: (1) the defendant made a false statement of material fact; (2) the defendant knew the

statement to be false; (3) the defendant intended to induce the plaintiff to act with the false

statement; (4) the plaintiff relied upon the truth of the false statement; and (5) the plaintiff

suffered damages as a result of relying on the false statement.  W.W. Vincent & Co. v. First

Colony Life Ins. Co., 814 N.E.2d 960, 969 (Ill. App. Ct. 2004).  A claim for negligent

---

[10]    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. See, e.g., McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992); Gillman v. Burlington N. R.R. Co., 878 F.2d 1020, 1022 (7th Cir. 1989). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Kunik v. Racine County, Wis., 946 F.2d 1574, 1579 (7th Cir. 1991) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)). The court will accept all well-pled factual allegations in the complaint as true. Miree v. DeKalb County, 433 U.S. 25, 27 n.2 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. Craigs, Inc. v. General Electric Capital Corp., 12 F.3d 686, 688 (7th Cir. 1993). However, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir. 1992).

    Here, the parties have cited to affidavits and other documents attached to their submissions. While this Court considered this evidence in ruling on the above motions, it will not consider it when deciding the Rule 12(b)(6) motion. Moreover, at this point in time, particularly given the fact that only limited jurisdiction discovery had been taken at the time this motion was filed, the Court will not convert the motion into a motion for summary judgment.

[11]    As explained above, this Court will apply Illinois substantive law to Extra's claims.

misrepresentation requires the same, except that: (1) instead of alleging that the defendant knew the statement was false, the plaintiff need only allege that the defendant was careless or negligent in ascertaining the veracity of the statement; and (2) the plaintiff must also allege that the party making the statement was "under a duty to communicate accurate information." Fox Assocs., Inc. v. Robert Half Int'l, Inc., 777 N.E.2d 603, 606 (Ill. App. Ct. 2002).

Here, Case contends that Extra has failed to plead an actionable claim for misrepresentation because: (1) Case Brasil ratified the Agreement, and thus, no false statement was made; and (2) Extra has not sufficiently alleged that it relied on a misrepresentation or that a misrepresentation caused it to suffer damages. Case also contends that the negligent misrepresentation claim fails because Extra has not alleged that the Case employees, who allegedly made the false statement, were under a duty to communicate accurate information. The Court will address these three contentions in turn.

First, Case contends that Extra has failed to allege the existence of a false statement because even if it signed the Waukegan Agreement without the authority to bind Case Brasil, Case Brasil ratified the Agreement two weeks afterwards when it signed a power of attorney ("the Power of Attorney") appointing Mr. Sharman its "attorney-in-fact." There are a number of problems with this contention. For one, the Power of Attorney is not mentioned nor attached to the Complaint, and therefore, in ruling on a Rule 12(b)(6) motion, this Court should not even take it into consideration. Moreover, even if this Court were to convert this motion into a motion for summary judgment, the parties have submitted conflicting affidavits as to whether the Power of Attorney is even valid under Brazilian law. Thus, at this time, dismissal on the grounds that

15

Case Brasil ratified the Waukegan Agreement by executing the Power of Attorney is not appropriate.[12]

Second, this Court finds that Extra has sufficiently alleged causation and reliance.[13] As set forth in more detail above, Extra alleges that Case "perpetrated a fraudulent scheme" to induce Extra to enter the Waukegan Agreement. As part of this scheme, Case "manipulated the corporate distinction between itself and Case Brasil" and misrepresented that Mr. Sharman had authority to sign the agreement on behalf of Case Brasil. "In reliance on [these and other] representations" Extra executed the Agreement and provided Case information regarding the wrong-doing by Case Brasil officers while keeping this information quiet so as not to upset Case's proposed merger. Extra further alleges that its reliance was "reasonable . . . as Mr. Sharman was a senior Case executive" who headed its Latin American operations, which included Case Brasil. As a result of its reliance, Extra alleges that it suffered damages including losing its Case distributorship and not resolving the illegal charge back dispute. Accordingly, this Court finds that Extra has sufficiently alleged reliance and causation.

---

[12]    The Court also notes that even if Case had authority to bind Case Brasil pursuant to the Power of Attorney, dismissal would not be proper because Extra alleges other misrepresentations, such as that Case knew that Case Brasil would not abide by the terms of the Agreement but nevertheless induced Extra to execute the Agreement.

[13]    The elements of causation and reliance for negligent misrepresentation are the same as for other torts – the plaintiff must allege it reasonably relied on the false statement and "but for" the false statement the plaintiff would not have incurred the harm alleged in the complaint. See Continental Assurance Co. v. Dean Witter Reynolds, Inc., 1993 WL 101448, at * 2 (N.D. Ill. April 5, 1993).

16

Third, Case also contends that Extra has failed to plead negligent misrepresentation because it has not sufficiently alleged that Case had a duty to supply accurate information to Extra. Extra does allege that "Case had a duty to communicate accurate information to Extra and Mr. Briante with respect to Case's authority to enter into the Waukegan Agreement." (Am. Complt. at ¶ 94.) While federal notice pleading it very lenient, this is a legal conclusion. Thus, the Court finds that this broad allegation is insufficient to plead a duty for a claim of negligent misrepresentation.

Realizing this defect, Extra contends that it has properly pled the existence of a duty by alleging that Case's senior in-house corporate counsel (Mr. Brian Cahill) had a duty to provide accurate information to Extra with regard to Case's authority to bind Case Brasil to the Agreement. The Court will thus examine when an attorney has a duty to provide accurate information to a third-party non-client.

Illinois law generally does not impose a duty to provide accurate information unless the defendant is in the "business of providing information for the guidance of others in business dealings." Guar. Residential Lending Inc. v. Int'l Mortgage Center, Inc., 305 F. Supp. 2d 846, 863 (N.D. Ill. 2004). This exception is usually applied to "pure information" providers such as banks providing credit information to a potential lender, real estate agents, title companies, and stock brokers. Fox Assocs., Inc., 777 N.E.2d at 607-08. In determining if such a duty exists, courts generally must make a "precise, case-specific inquiry." Guar. Residential Lending Inc. v. Int'l Mortgage Center, Inc., 305 F. Supp. 2d at 863. While "supplying information need not encompass" the parties' "entire" business dealings, it must have been "central to business transaction between the parties." Fox Assocs., Inc., 777 N.E.2d at 607. The court thus must

17

carefully examine "the nature of the information at issue and its relation to the kind of business being conducted" and what was the "ultimate" goal of the parties' business transaction. Id. at 608-09.

For a non-client to make a claim of negligent misrepresentation against an attorney, the non-client must allege more than the fact that the attorney supplied information to it to facilitate a transaction between the client and the non-client. See Astor Chauffeured Limousine Co. v. Runnfeld Investment Co., 1988 WL 101267, at *5-6 (N.D. Ill. Sept. 1988) (rejecting a broad proposition that attorneys are in the business of supplying information and thus have a general duty to provide accurate information to non-clients). Instead, the court must closely examine the transaction between the client and the non-client and what role the attorney played in the deal. Id. For an attorney to have a duty to provide accurate information to a non-client, the non-client must allege that "the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." Greycas v. Proud, 826 F.2d 1560, 1563-64 (7th Cir. 1987). See also Wafra Leasing Co. v. Prime Capital Corp., 192 F. Supp. 2d 852, 874 (N.D. Ill. 2002); Astor Chauffeured Limousine Co.,1988 WL 101267, at *5-6.

In cases where a duty was found to lie, the client retained the attorney for the limited purpose of supplying the non-client information to facilitate a particular business transaction. For example, in Greycas, 826 F.2d at 1562, the attorney was retained to assist in the completion of a loan. Pursuant to the loan agreement, the prospective borrower retained the attorney for the sole purpose of conducting a search for existing liens on the collateral. Id. The attorney, despite not conducting a lien search, sent a letter to the lender/non-client stating that there were no liens on the collateral. Id. After it turned out that there were existing liens, the non-client sued the

18

attorney for negligent misrepresentation. Id. Affirming judgment against the attorney, the Seventh Circuit held that the attorney had a duty to supply the non-client with accurate information because the client retained the attorney for the sole purpose of supplying information to the non-client to facilitate the transaction between his client and the non-client. Id. at 1563-65.

Similarly, in Wafra Leasing Co., 192 F. Supp. 2d at 858, 874, a non-client sued an attorney who prepared an opinion letter valuing assets which the non-client later purchased. In denying the attorney's motion to dismiss, the court noted that the non-client sufficiently pled negligent misrepresentation by alleging that the client retained and directed the attorney to draft the opinion letter, which was intended to benefit the non-client in the transaction with the non-client. Id.

In contrast to Greycas and Wafra, the court in Astor Chauffeured Limousine Co.,1988 WL 101267, at *5-6, held that an attorney did not have a duty to supply accurate information to a non-client. The plaintiffs in Astor entered into an agreement to sell a business which was owned in part by the defendant attorney. Id. at *1-2. The plaintiffs alleged that the attorney "made several material misrepresentations and failed to disclose several material facts in [the] written agreement and during the course of their prior negotiations." Id. at *2. In granting summary judgment on the negligent misrepresentation claim against the attorney, the court held that he did not owe a duty to the non-client plaintiffs because his representation was not "intended to confer directly a benefit upon plaintiffs." Id. at *5. This decision was based in large part on the plaintiffs allegation that "the purpose" of the attorney's "representation was to induce [the] plaintiffs to purchase . . . two companies that would soon be financial failures." Id.

Here, unlike Greycas and Wafra, Extra has not alleged that Mr. Cahill was retained to supply information to Extra for the purpose of facilitating the execution of the Waukegan Agreement. Instead, like the plaintiff in Astor, Extra alleges that the purpose of Mr. Cahill's representation was to draft the Agreement and to induce Extra to enter into the Agreement, which only provided illusory benefits to Extra. Moreover, as in-house counsel for Case, this Court fails to see how Extra could allege that Mr. Cahill was retained by Case solely to provide information to Extra. This Court has not found, nor has Extra cited, any authorities holding that an in-house counsel has a duty to supply accurate information to entities other than to its employer/client.

A close look at the facts alleged in the Complaint reveal that Mr. Cahill acted in a manner consistent with representing his client (Case), not that he was retained to supply information to Extra. Mr. Cahill first met with Extra on October 13, 1999, in Brazil to discuss why Extra had filed objections to Case's proposed merger and to attempt to get more information regarding the improper conduct by officers at Case Brasil. Extra informed Mr. Cahill that its "objections were filed to get Case's attention" so it could discuss the improper charge backs by Case Brasil. (Am. Complt. at ¶¶ 39-40, 48-50.) Shortly after returning to the United States, at the request of Extra, Mr. Cahill arranged a meeting in Waukegan, Illinois between himself, Mr. Sharman, Mr. Briante, and Extra's Brazilian attorney. To keep their meeting a secret – so as not to alert the Case Brasil officers suspected of the wrongdoing – Mr. Cahill arranged for the parties to meet in a conference room at an airport in Waukegan, Illinois. Extra alleges that the secrecy of the meeting was essential because Mr. Briante was afraid that the Case Brasil officers might have him killed if they learned that he was informing

the home office of their wrongful conduct. The night before the meeting, Mr. Cahill prepared a draft of the Agreement without consulting Case Brasil. (Id. ¶¶ 50-53.)

At the start of the meeting, which took place in Illinois on October 19, 1999, either Mr. Cahill or Mr. Sharman immediately asked Mr. Briante to detail the improper conduct of the Case Brasil officers. In response, Mr. Briante stated that he would not divulge any information until Extra's concerns – the improper charge backs and continuation of its distributorship – were resolved. Later that day, after Mr. Cahill made the alleged misrepresentations, Extra executed the Agreement and then gave Case the desired information.

This Court thus holds that Extra has not alleged sufficient facts to plead that Mr. Cahill had a duty to supply it with accurate information and thus cannot plead negligent misrepresentation. To hold otherwise would result in all in-house attorneys being liable for negligent misrepresentation for making any incomplete or inaccurate statements when negotiating a contract on behalf of their employers. Such a result would contravene the long-standing policy under Illinois law to narrowly construe the "tort of negligent misrepresentation" to "preserve the sphere appropriately governed by contract law from intrusion by tort." See Continental Assurance Co. v. Dean Witter Reynolds, Inc., 1993 WL 101448, at *13 (N.D. Ill. April 5, 1993). Accordingly, this Court grants the motion to dismiss as to the negligent misrepresentation claim.

## B.    Promissory Fraud

To state a claim for promissory fraud under Illinois law, a plaintiff must allege that the defendant made a false promise or representation of future performance, "not intending to keep the promise but intending for another party to rely on it, and where the other party" in fact relied on the false promise to its detriment. Bower v. Jones, 978 F.2d 1004, 1011 (7t h Cir. 1992). "To survive the pleading stage," the plaintiff must also allege "specific, objective manifestations of fraudulent intent – a scheme or device" used to "accomplish the fraud." Id. at 1011-12. In determining if a plaintiff has sufficiently pled intent, courts examine whether the defendant had a motive and what benefits were bestowed on the defendant by not following through on its alleged promise. See id. When analyzing whether there was a scheme to defraud, courts look at whether the alleged "broken promise is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance against which the law ought to provide a remedy." AAR Int'l, Inc. v. Vacances Heliades S.A., 202 F. Supp. 2d 788, 799 (N.D. Ill. 2002) (finding a scheme to defraud adequately alleged where "defendants alleged a number of related broken promises").

Here, after carefully examining the Complaint, this Court finds that Extra has sufficiently pled fraudulent intent and the existence of a scheme to defraud. Extra alleges that in October of 1999, Case was facing a pending crisis as a result of illegal conduct by certain Case Brasil officers. Case was allegedly fearful that this illegal conduct would hurt Case's Latin American sales, result in litigation in Brazil, and derail on-going negotiations which Case was undertaking to merge with another company. Although Case had investigated the improprieties at Case Brasil, it was unable to procure sufficient evidence to adequately handle the situation. To

22

resolve this problem, Case looked to Extra, which had the evidence that Case needed to fire the Case Brasil officers engaged in the illegal conduct.

According to Extra, Case (by Sharman and Cahill) "perpetrated a fraudulent scheme" and "made utterly reckless misrepresentations" to Extra to induce Extra to come to Illinois to enter into the Waukegan Agreement, knowing that Case Brasil, who was to take action under the Agreement, would not follow or comply with the terms of the Agreement. As part of this scheme, Case allegedly : (1) "manipulated the corporate distinction between itself and Case Brasil" and (2) misrepresented Mr. Sharman's authority to sign the agreement on behalf of Case Brasil. Case also promised Extra that Case Brasil would, among other things, retain Extra as a distributor and resolve the improper charge back dispute. In return, Extra agreed to: (1) provide Case with information regarding fraudulent activities of executives at Case Brazil; (2) not contest the propose merger between Case and a third-party; and (3) limit its claims against Case Brasil regarding illegal charge backs.

Immediately after signing the Agreement, Extra provided Case with detailed proof of the improper conduct of the Case Brasil officials. Armed with this information, Case then fired these employees. With the problems at Case Brasil resolved and with Extra not objecting, Case was then able to complete its merger. Despite having fulfilled its obligations under the Agreement, Extra alleges that Case Brasil has completely disavowed any duty to perform. According to Extra, contrary to statements made prior to the signing and in the Agreement, Mr. Sharman was not an officer of Case Brasil and had no authority to bind Case Brasil to the Agreement. After receiving the benefits under the Agreement, Case now allegedly asserts that this dispute is between Extra and Case Brasil.

23

Accordingly, this Court finds that Extra has sufficiently alleged fraudulent intent and a scheme to defraud and thus DENIES Case's 12(b)(6) motion to dismiss Extra's promissory fraud claim.

## C.    Rule 9(b) Pleading Requirements

Rule 9(b) provides that "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b).  Circumstances constituting fraud "include the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." General Elec. Capital v. Lease Resolution, 128 F.3d 1074, 1078 (7th Cir. 1997).  In other words, Rule 9(b) requires a plaintiff to plead "the who, what, when, where and how" of the fraud. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).  The purpose underlying Rule 9(b)'s particularity requirement is to: (1) protect the defendant's reputation; (2) minimize "strike suits and fishing expeditions"; and (3) provide notice of the claim.  Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 777 (7th Cir. 1994).  However, although a plaintiff must plead the circumstances of the alleged fraud with particularity, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

Here, a careful review of the Complaint reveals that Extra has adequately pled facts setting forth "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." General Elec. Capital, 128 F.3d at 1078.  For example, as set forth in detail above, Extra alleges that Mr. Cahill induced Extra to come to Illinois by leading Extra to believe that Mr. Sharman had authority to bind Case Brasil.

24

Based on this representation, on October 19, 1999, Mr. Briante flew to Waukegan, Illinois to meet with Sharman and Cahill. At this meeting, Sharman and Cahill: (1) "manipulated the corporate distinction between itself and Case Brasil" and (2) misrepresented that Mr. Sharman had authority to sign the agreement on behalf of Case Brasil, when he in fact did not. Likewise, the Agreement, drafted by Mr. Cahill, stated that Mr. Sharman had authority to bind Case Brasil.

Accordingly, this Court finds that Extra has pled sufficient facts to meet Rule 9(b)'s heighten pleading standard, and therefore, this Court DENIES the motion to dismiss on the grounds that the fraud claims do not comply with Rule 9(b).

## IV.    Motion to Strike

Case has also moved to strike paragraphs 33-36, 46-47, and 63-67 in the Complaint. Federal Rule of Civil Procedure 12(f) gives courts discretion to strike allegations in a complaint that are "immaterial, impertinent, or scandalous." Such motions, however, are "not favored" and will only be granted where the allegations have "no relation to the controversy and [are] unduly prejudicial." Villalovos v. Sundance Assocs., Inc., 2003 WL 1152443, at *5 (N.D. Ill. Jan. 13, 2003). Allegations are "immaterial" for purpose of Rule 12(f) only if they have "no essential . . . relationship to the claim[s]." Chicago Printing Co. v. Heidelberg, 2001 WL 1646567, at *1 (N.D. Ill. Dec. 21, 2001). When determining whether an allegation is "immaterial" the court must consider whether the facts alleged "possib[ly] . . . form the basis for admissible evidence." Id. See also Sutton Place Dev. Co. v. Green, 1987 WL 5951, at *1 (N.D. Ill. Jan. 27, 1987) (allegations are only immaterial if they "have no possible bearing on the issues at trial"). Similarly, a matter is "impertinent if it is neither responsive nor relevant to the issues involved in

the action." Sutton Place Dev. Co., 1987 WL 5951, at *1. A "scandalous" allegation is one which "unnecessarily reflects upon the moral character" of the defendant. Id.

The burden to meet the above strong showing is on the movant, who must specifically explain why the paragraphs are repetitive, immaterial, or scandalous. Id. Even if such a showing is made, however, the motion should be denied if "the allegations might serve to achieve a better understanding of the claim . . . or perform some other useful purpose in the just disposition of the litigation." Woodson v. Cook Co. Sheriff, 1996 WL 604051, at *5 (N.D. Ill. Oct. 18, 1996).

With the above standards in mind, the Court now turns to the specific paragraphs which Case seeks to strike. Paragraphs 33-36 and 46-47, detail the alleged improper conduct by Case Brasil officers (including the illegal charge backs to Extra) and Case's internal investigation into this conduct before signing the Agreement. Paragraphs 63-67 pertain to the information which Extra supplied to Case pursuant to the Waukegan Agreement and what Case did with this evidence, e.g., it fired the corrupt Case Brasil employees. These allegations are relevant to Case's intent and motivation to defraud Extra and what benefits Case received under the Agreement. Accordingly, because these paragraphs supply relevant information and do not appear overtly prejudicial, this Court DENIES Case's motion to strike.

## CONCLUSION

For the reasons discussed, this Court: (1) DENIES Defendant Case Corporation's Motion to Dismiss [28-1] with respect to the fraud claims (Counts I and III) but GRANTS it as to the negligent misrepresentation claim (Count II); and (2) DENIES Case's request to strike.

ENTER:

*Blanche M. Manning*

**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE:_____